U.S. DISTRICT COURT – N.D. OF N.Y.

FILED

**March 26, 2026**

John M. Domurad, Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**ALBANY, NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel*.  MATTHEW WELCH AND JAMES SECHRIST,<br><br>     Plaintiffs,<br><br>     v.<br><br>AMERICAN FIRST CONTRACTING, INC.; BROADWAY ELECTRIC, INC.; CORNERSTONE CONTRACTING; INNOVATIVE SUPPORT SOLUTIONS, INC.; AFCI-CCI-JV ONE LLC; JOHN OEHLER; and CHRISTIAN BLAKE,<br><br>     Defendants. | **NO.**  5:23-cv-525 (AJB/ML)<br><br>**AMENDED COMPLAINT PURSUANT TO FEDERAL FALSE CLAIMS ACT,31 U.S.C. § 3729 *et seq.*,**<br><br>**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**<br><br>**NOT FOR PUBLIC DISCLOSURE DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER**<br><br>**AND DEMAND for JURY TRIAL** |

---

*AMENDED QUI TAM* **COMPLAINT**

---

This is an action brought by Relators Matthew Welch ("Relator Welch or "Welch") and James Sechrist ("Relator Sechrist or "Sechrist") (collectively Relators) on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"). In support thereof, Relators allege the following:

**I.    OVERVIEW**

1.     This action is in response to a fraudulent conspiracy which egregiously deprived deserving service-disabled veterans valuable contracting opportunities. Defendant American First Contracting, Inc., ("AFCI"); Defendant Broadway Electric, Inc.("BEI"); Defendant

Cornerstone Contracting, Inc. ("CCI"); Defendant Innovative Support Solutions, Inc. ("ISSI"); Defendant AFCI-CCI-JV ONE LLC (« ACJVIL »);  Defendant John Oehler ("Oehler"); and Defendant Christian Blake ("Blake") (collectively "Defendants") conspired together and utilized service-disabled-veteran-owned-small-business-concerns ("SDVOSBC" or "concern") as shells to fraudulently win federal set-aside contracts and task orders.

2.      The Defendants' fraudulent schemes financially impacted the Department of Veterans Affairs ("VA"), Department of the Army, Public Building Services, U.S. Fish and Wildlife Service, Bureau of Prisons, Forest Service, and the Department of the Air Force. In fact, since 2016, Defendants have received in aggregate over $200 million in Government contracts.

3.      On November 5, 2020, Defendant ACJV1L won as the lowest bidder, the Bath VA Medical Center Project ("Bath VA Project") set-aside contract in Bath, New York. Relator Welch, via his father's firm Welch Construction, Inc. ("WCI"), also bid on the same project. This was the second occurrence where Defendant ACJV1L beat out WCI as the lowest bidder on a set-aside contract. Previously, Defendant ACJV1L won as the lowest bidder for the VA Woodlawn Bath Cemetery Repair Project ("Bath Cemetery Project") SDVOSB set-aside contract under solicitation number 36C786-20-B-0009. This project was also located in Bath, New York. Hence Welch, in consultation with his father, Mark Welch (Owner and President of WCI and a (disabled veteran) initiated an investigation because Defendants exhibited unusual business practices during the pre-bid process, which is described in detail below.

4.      This investigation quickly raised troubling facts, which led WCI to file an initial SDVOSB status protest with the Bath VA Project Contracting Officer on November 10, 2020. Shortly thereafter, Welch began a more comprehensive investigation to include reaching out to Relator Sechrist for assistance. That investigation led WCI to file a supplemental package with

the Small Business Administrations ("SBA") Office of Hearing and Appeals ("OHA") on

5.      December 29, 2020. The supplemental package contained extensive evidence that Defendants had a history of acting as affiliated entities since as early as August 2015.

6.      On December 30, 2020, Defendant AFCI-CCI responded to WCI protest with a point-by-point attempt to discredit WCI's initial protest. Defendants' response contained multiple factual misrepresentations, which are detailed below.

## II.     **<u>JURISDICTION AND VENUE</u>**

7.      This action arises under the Federal FCA. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

8.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be found in, reside in, transacted business in and/or have committed the alleged acts in the Northern District of New York.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because all the Defendants can be found in, reside in or have transacted business in the Northern District of New York, and many of the alleged acts occurred in this District.

10.     Relators know of no other FCA complaints that have been filed against Defendants alleging the same or similar actions. Additionally, Relators learned of all the conduct underlying these allegations through personal experience, observations, and utilizing specialized knowledge in Government contracting and the SDVOSB program. Accordingly, Relators are an original source as defined in 31 U.S.C. § 3730(e)(4)(B). Relators made voluntary disclosures to the United States prior to the filing of this lawsuit.

## III.    **<u>PARTIES</u>**

11.     The real party in interest in this case is the United States (also referred to herein as the "Government"). The Government, through the SBA programs, solicited proposals from small businesses and awarded the contracts and task orders at issue in this action. As described more fully below, the Government set-aside those contracts for small businesses to foster the development of the small businesses, including those owned by veterans who became disabled while serving in the United States military.

**A.     RELATORS**

12.     **Relator Matthew Welch**, a resident of Syracuse, New York, is Vice President of WCI, an SDVOSB qualified building construction firm with offices in Marcellus, New York and Myrtle Beach, South Carolina. Relator Welch's father, Mark Welch, is the owner and President of WCI and is a disabled veteran with over fifty years in the building construction industry.

13.     WCI has been involved in over two hundred (200) SDVOSB contract bids since 2011. Thus, Relator Welch has a great deal of experience in all aspects of Government set aside contracting. Relator Welch came into acquaintance with Relator Sechrist due to his involvement with SDVOSB contracting.

14.     **Relator James Sechrist,** a resident of Milford, Pennsylvania, is a retired Air Force veteran. While serving, Relator Sechrist was assigned to work in Procurement where he first learned about Government contracting. In 1979, Sechrist retired from the military after twenty (20) years and joined Brodart Industries as their Purchasing Director, which allowed him to further develop his procurement skills. Later, Sechrist was hired by the Air Force as a civilian employee, eventually working his way up Deputy Operational Contracting Chief at Griffiss Air Force Base in upstate New York.

15.     After retiring from the Civil Service, Relator Sechrist combined his passion for helping military veterans and his fifty (50) plus years of Government contracting experience, to voluntarily assist the SBA and the VA by identifying potentially fraudulent SDVOSB cases. Sechrist's volunteer work has led to multiple SDVOSB VA OIG investigations. Also, his reputation and expertise in the SDVOSB program has led to the United States General Accounting Office consulting with him on identifying fraud in the Veterans First Program.

## B.     DEFENDANTS

16.     **Defendant AFCI** is an Illinois based SDVOSB promoting itself as providing civil engineering, general contracting, and construction management services.  The founder and current president is Mark Roeckell ("Roeckell"). Roeckell claims to be a U.S. Navy Veteran. Defendant AFCI has two business addresses: 2800 West Higgins Road, Suite 980, Hoffman Estates, Illinoi, 60169 and 837 F2, Oakton Street, Elk Grove Village, Illinois, 60007.[1]  The Oakton Street address is co-located in the same building with Defendant entities BEI and CCI.[2] The initial registration date for Defendant AFCI on the United States General Services Administration's System for Award Management ("SAM") database was October 2, 2009. Defendant AFCI has Unique ID #NTZEKNYBD4J9. A review of the Federal Procurement Data System ("FPDS" and the federal database for Government contracts) returned a total of seventy-eight (78) awarded entries with an action obligation value of over $43,297,598. The earliest contract entry is for 2009. Defendant AFCI was first certified as an SDVOSB under the VA Center for Verification and Evaluation ("CVE" and the VA's former verification system for

---

[1] The Hoffman Estates address is reported in Westlaw Company Investigator Report, dated October 3, 2022. Whereas the Elk Grove Village address is reported on SAM, AFCI's website, and via Google Maps.
[2] 831 Oakton Street is a rectangular single-story commercial building that faces north towards the street. 837 F2 Oakton is a suite at the opposite end of the same building and is accessed from the south end, from the parking lot.

veterans[3]) on April 24, 2015. Additionally, on May 24, 2017, Defendant AFCI was granted "No-Change Affidavit Approval" as an SDVOSB for the Illinois Department of Central Management Services. This permitted Defendant AFCI to remain a certified firm for the Illinois Veterans Business Program ("VBP").

17.     On April 28, 2020, Defendant entities AFCI and CCI were approved under the SBA's Mentor-Protégé Program ("MPP") as both a SDVOSB and a Veteran Owned Small Business ("VOSB") entity. Defendant AFCI was the protégé and Defendant CCI was the mentor. Additionally, Defendant entities AFCI and CCI formed two (2) joint ventures, ACJV1L and AC JV One.  Defendant entities use Western Surety Company ("WSC") for construction bonding.

18.     **Defendant Cornerstone Contracting, Inc.,** (Duns # 037586354) was originally founded in the mid-90s by Oehler and partner, Blake as Broadway Construction. Currently, Blake is the President, and the headquarters is located at 831 Oakton Street, Elk Gove Village, Illinois, 60007. As noted above, this building location also contains the headquarters of Defendant entities BEI and ACFI. Defendant CCI is registered in SAM under unique ID number G21KSR6BQAW8 and was first registered on May 30, 2018. Defendant CCI claims on their website to have projects across the country and is bidding in all fifty (50) states. A search of the FPDS website determined that Defendant CCI has no recorded history of winning Government contracts.

19.     **Defendant BEI** was founded in 1984 by Oehler. Initially, Oehler formed the company in Chicago and then moved it to Elk Grove in 2004. Defendant BEI provides electrical construction, design/build construction, construction management, project management, pre-construction services, and general construction. Defendant BEI headquarters is at 831 Oakton

---

[3] Effective January 1, 2023, the VA's CVE ceased accepting applications and all certifications for certifying Veteran Owned firms was moved to the SBA.

Street, Elk Grove, Illinois, the same building location as Defendant entities CCI and AFCI. Defendant BEI is registered with SAM and has unique entity ID LK9SJR79LUR8. Also, SAM lists Blake as the President of Defendant BEI at the Elk Grove Village address. Further, Oehler is indicated on SAM as the Point of Contract and for Past Performance for Defendant BEI, also returning to the Elk Grove Address.

20.    The Illinois Department of State Corporate filings (S Corp) list Blake as the President and Secretary of Defendant BEI. A review of FPDS returned one-hundred and eighteen (118) entries with action obligations valued in sum at $48,928,980. The earliest entry was from 1992.

21.    **Defendant Innovative Support Solutions, Inc.,** was first registered with the Illinois Secretary of State on September 15, 2009. Defendant ISSI is an active Illinois LLC with a principal office address of 259 E 3rd ST, Elmhurst, Illinois 60126.  The President of Defendant ISSI is Benjamin P. Rush ("Rush"). This business address is a single-family residential home. Defendant ISSI is registered with SAM under Unique Entity ID of HUZQQ7RGZ6K8. FPDS reflects three hundred and twenty-nine (329) entries for Defendant ISSI with over $166M in actions obligated. The earliest contract is from July 2012. Defendant ISSI is also self-certified as a VOSB and a SDVOSB.

22.    Rush was also the owner of IPB, LLC ("IPB"), an electrical contractor, which had a business address that returned to 831 Oakton Street in Elk Grove Village, same as Defendant entities BEI and CCI. IPB was first formed on the same date as Defendant ISSI, September 15, 2009, and was involuntarily dissolved on March 8, 2013. Further, IPB shared the same telephone number with Defendant ISSI, 630-834-3206. Finally, IPB was an SDVOSB that was awarded a single SDVOSB contract on October 29, 2009, under solicitation # VA-69D-09-RA-0478.

23.     **Defendant AFCI-CCI-JV One, LLC,** was first registered with the Illinois Department of State on or about May 20, 2020. Roeckell and Blake are listed as the managers for ACJV1L. The address reported to the State was 837 Oakton Street, Suite F, Unit 2, Elk Grove Village, Illinois, 60007. Also, the LLC documents indicate that a Defendant BEI employee is the listed agent for ACJV1L, Michael Barr ("Barr"). Barr's address on the LLC document returns to 831 Oakton Street. A review of Zoomiinfo.com shows that Barr is listed as a Supervisor of Postproduction for Defendant BEI.

24.     FPDS indicates that ACJV1L has seventy-five (75) separate entries for a sum total of over $111 million in action obligations.

25.     **Defendant John Oehler** is a 63-year-old male resident of Mount Prospect, Illinois. Oehler is the founder of BEI and co-founder of Cornerstone, and he is one of the primary architects and co-architect of this fraudulent scheme.

26.     **Defendant Christian Blake** is a 50-year-old male resident of Naperville, Illinois. Blake is the current President of BEI and Cornerstone, and along with Oehler, is the co-architect of this fraudulent scheme.

## IV.     <u>REGULATORY OVERVIEW</u>

27.     The Veterans Entrepreneurship and Small Business Development Act of 1999 § 101(3) (the "Act if 1999") found that the United State did "too little" to help service-disabled veterans in pursuing small business opportunities. Thus, the Act of 1999, directed certain agencies to formulate and execute strategies and organizations to coordinate small business opportunities for service-disabled veterans. *Id* at 102 (2) and (3).

28.     Pursuant to the authority of 15 U.S.C. 657b (a) and (b), the SBA established an Office of Veterans Business Development, which is responsible for the management of small business concerns owned and controlled by service-disabled veterans. Additionally, the law

authorized the formation of an interagency task force designed to coordinate Federal contracting goals for SDVOSBs. *Id* at (c)(1).

## A.    THE SERVICE-DISABLED VETERAN OWNED SMALL BUSINESS PROCUREMENT PROGRAM

29.    The Veterans Benefits Act of 2003 (the "Act of 2003") created a procurement program by which Federal contracting officers were permitted to restrict awards to SDVOSBs, if the contracting officer has a reasonable belief that two or more concerns were submitting offers and the offers were at fair market prices. 15 U.S.C. § 657f(b). Contracts and task orders whose solicitations limit participation to SDVOSBs are generally referred to as being "set-asides."

30.    A small business is potentially eligible to bid as an SDVOSB on set-aside contracts and task orders if it meets the following ownership, control, and size criteria:

a) The business is majority-owned (not less than 51%) by one or more service-disabled veterans;

b) One or more service-disabled veterans or, in the case of a service-disabled veteran with a permanent and severe disability, the spouse or permanent caregiver of such veteran, control the management and daily business operations; and

c) At the time of the contract offer, the business is "small" within the size standard corresponding to the North American Industry Classification System ("NAICS") code assigned to the industry. 13 C.F.R. §§ 125.8, 125.11.

## B.    OWNERSHIP OF A SDVOSB

31.    To satisfy the ownership criteria, a small business concern is "owned" by service-disabled veterans when one or more service-disabled veterans have direct and unconditional ownership of that concern. 13 C.F.R. § 125.12(a). In the case of partnerships and limited liability companies, service-disabled veterans must own unconditionally at least 51% of each class of partnership or membership interest. 13 C.F.R. § 125.12(b)(c). If the small business concern is a corporation, "at least 51% of the aggregate of all stock outstanding and at least 51% of each class of voting stock must be unconditionally owned by one or more service-disabled veterans. 13

9

C.F.R. § 125.12(d).

32.    Also, if the small business concern allocates annual profits via dividends and distributions, then at least 51% of such must be paid to a service-disabled veteran who is the owner of the small business concern. 13 C.F.R. § 125.12(g).

### C.    CONTROL OF A SDVOSB

33.    To satisfy the control criteria, a small business concern is "controlled by service- disabled veterans when one or more service-disabled veterans conducts both the concern's long- term decision-making and its day-to-day management and administration of business operations." 13 C.F.R. § 125.13(a). The daily business operations of an SDVOSB may include, but is not limited to, "the marketing, production, sales, and administrative functions of the firm, as well as the supervision of executive team, and the implementation of policies." 13 C.F.R. § 125.11.

34.    Additionally, a non-SDVOSB may be found to control the concern via loan arrangements, even where the loan or loan guarantees are made under commercially reasonable terms. 13 C.F.R. § 125.13(j).  The SBA considers the terms and conditions of the loan or loan guarantees, along with other relevant factors when assessing who controls the small business concern. *Id.*

35.     Control over a SDVOSB is a rebuttable presumption when a service-disabled veteran does not work for the concern during the concern's normal business hours. 13 C.F.R. § 125.13(k).  Furthermore, if the service-disabled veteran has other full or part-time work, or full or part-time studies, or engages in other activities where his/her activity prevents the service-disabled veteran from working for the small business concern, then there is a rebuttable presumption that a service-disabled veteran does not control the small business concern. *Id.*

### D.    CERTIFICATION AS SDVOSB

36.    Under SBA regulations SDVOSBs must meet several requirements to submit an offer on a set-aside contract. Specifically, the concern must represent: (a) that it is indeed an SDVOSB; (b) that it is "small" as defined by the regulations; (c) that it will meet the percentage of work cost expenditures for subcontracting; and, if applicable, that it is an eligible joint venture and/or non-manufacturer. 13 C.F.R. § 125.18(a).

37.    All bids, proposals, and applications for any SDVOSB award are deemed to be self-certifications of SDVOSB status. 13 C.F.R. § 125.15; 13 C.F.R. § 125.32(a)(b)(1). Additionally, a contractor's registration as a qualified SDVOSB on federal electronic databases while competing for SDVOSB contracts is deemed a certification. 13 C.F.R. § 125.32(a)(b)(3). Finally, a signed certification representing SDVOSB status must be included on all submissions during a SDVOSB bid process. 13 C.F.R. § 125.32(c).

38.    The penalties for misrepresenting the status of an SDVOSB include suspension or debarment; civil penalties pursuant to the Federal False Claim Act, 31 U.S.C. §§ 3729-3733 and Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; and criminal penalties pursuant to 18 U.S. Code § 1001 and 18 U.S.C. § 287. *Id* at (e)(1-3).

**E.    SYSTEM FOR AWARD MANAGEMENT AND CERTIFICATIONS**

39.    The System for Award Management ("SAM") is the Government's main database for potential Federal awardees and the centralized Government system for certain contracting, grants, and other assistance-related processes. It includes data collected from prospective Federal awardees required for the conduct of business with the Government and requires prospective contractors to submit annual representations and certifications in accordance with FAR subpart 4.12. 48 C.F.R. § 52.204-13(a)(4).

40.    SAM facilitates contracting with the Government because government contractors need only submit specific information or certification status to one source, thus

11

incorporating by reference contractor's representations and certifications for future awarded contracts. 48 C.F.R. § 4.1200(a-c). Contractors are required to complete electronic annual representations and certifications as part of SAM registration. 48 C.F.R. § 4.1201(a). Besides annual certifications, contractors must update the SAM database to ensure the information is "current, accurate, and complete." 48 C.F.R. § 52.204-13(c).

**F.      SBA SIZE STANDARDS AND NORTH AMERICAN INDUSTRY CLASSIFICATION SYSTEM ("NAICS")**

41.      To satisfy the size criteria, a small business concern is "small," and therefore eligible for federal small business programs and preferences, when it meets the SBAs' size standards. 13 C.F.R. § 121.101(a). These standards have been developed by the SBA for different industries under NAICS. *Id*. NAICS assigns 6-digit codes to twenty broad sectors covering the economy. *Id* at (b). Individual NAICS codes can be looked up at 13 C.F.R. § 121.201.

42.      Size is defined as either the small business concerns' total average annual receipt or the total average number of employees. 13 C.F.R § 121.104, 13 CFR § 121.106. For example, under NAICS industry category 621111 (Offices of Physicians, except Mental Health Specialists), a small business concern has a maximum allowable total average annual receipt of $11 million. 13 C.F.R. § 121.201.

43.      Concerns self-select NAICS codes associated to their line of business when registering on SAM.  Also, the concern, to qualify as a small business, must not exceed the size standard for the NAICS code listed on a solicitation for a government contract. 13 C.F.R. § 121.402(a).  The SBA deems a size status effective with a concern and its affiliates, upon the submission of a written self-certification during an initial offer or otherwise part of a formal response, including pricing. 13 C.F.R. § 121.404(a).

**G.      SDVOSB CERTIFICATION WITH DEPARTMENT OF VETERANS**

**AFFAIRS.**

44.     Prior to January 1, 2023, the VA maintained its own separate verification process for concerns seeking contracting opportunities. Hence, the VA's "Vets First Verification Program," was created and established contracting opportunities for concerns seeking to compete for VA set-asides. The verification process was run by the Center for Veterans Enterprise ("CVE") a subdivision of VA's Office of Small and Disadvantaged Business Utilization ("OSDBU"), within the VA. The CVE aided veterans interested in founding or growing their own small businesses and helps VA contracting offices find qualified concerns. 38 C.F.R. § 74.1.

45.     The CVE verified SDVOSBs and VOSBs according to the tenets found in 38 C.F.R. § 74, which addressed Veteran eligibility, ownership, and control. The Vendor Information Pages ("VIP") was a database of businesses eligible VA contractors.  38 C.F.R. § 74.10.  Ownership and control criteria were determined in accordance with 13 C.F.R. § 125., 38 C.F.R. § 74.3, and 38 C.F.R. § 74.4. Additionally, the CVE required that an applicant must submit documentation, including, but not limited to: "Articles of Incorporation/Organization; corporate bylaws or operating agreements; shareholder agreements; voting records and voting agreements; trust agreements; franchise agreements, organizational, annual, and board/member meeting records; stock ledgers and certificates; State-issued Certificates of Good Standing; contract, lease and loan agreements; payroll records; bank account signature cards; financial statements; Federal personal and business tax returns for up to three (3) years; and licenses." 38 C.F.R. § 74.12.

46.     The CVE did not determine affiliation between entities. Instead, affiliation was assessed by the SBA in accordance with 13 C.F.R. § 121. 38 C.F.R. § 74.5(a). A joint venture was permitted for inclusion on the VIP but must prove the concern associated with the joint

venture was verified by the CVE, and the joint venture agreement met the criteria established by the SBA in 13 C.F.R. § 124. *Id* at (b)(1) and (2).

47.     If the CVE verified an applicant and later determined that a false statement was submitted by said applicant, then the applicant would be immediately removed from the VIP database.  38 C.F.R. § 74.2(c).  Furthermore, the CVE forwarded evidence of the false statement by the applicant to the VA Office of Inspector General, along with a request that debarment proceedings against the applicant begin by the VA. *Id.*

48.     However, the SBA authorizes a waiver to affiliation so long as the participants in the MPP fully comply with the procedures set forth in 13 C.F.R. § 125.9. Moreover, affiliation may exist in circumstances where there are questions involving:  stock ownership of the concern, common management, an identity of interest, newly organized concern rule, and engagement in joint ventures. 13 C.F.R. §103(c) and (e - h).

49.     Under stock ownership regulations, a service-disabled veteran must control 50% or more of the concern's voting stock or an affiliation exists. *Id* at (c)(1). A question of affiliation exists when senior officers, members, or management of one organization have the ability to control another concern. *Id* at (e). Also, affiliation can exist when two (2) or more individuals share identical business or economic interests. *Id* at (f). In fact, the "SBA may presume an identity of interest based upon economic dependence if the concern in question derived 70% or more of its receipts from another concern over the previous three (3) fiscal years." *Id* at (f)(2). If former senior members or "key employees" of one entity form another concern in the same or related industry and then begin to arrange business relationships where the older firm feeds the newer firm, then an affiliation may exist. *Id* at (g).  Finally, an affiliation may exist when two (2) entities enter more than three (3) joint ventures over a two (2) year period. *Id* at (h).

**H.    MENTOR–PROTÉGÉ PROGRAM.**

50.    In July 1998, the SBA created an MPP pursuant to Section 8(a) of the Small Business Act of 1978.  Subsequently, in August 2016, the SBA extended the program to other programs including the SDVOSB. The purpose of the program is for small businesses concerns ("protégés") to receive business development assistance from experienced companies of any size ("mentors") so the "protégé firms may more fully develop their capabilities." 13 C.F.R. § 125.9(a).  A protégé means "a small business concern that is eligible to enter into federal prime contracts and subcontracts and satisfies any other requirements imposed by the Administrator." 15 U.S.C. § 657(d)(3)(a). A mentor means a for-profit business concern, of any size, that can assist and commits to assisting a protégé to compete for federal prime contracts and subcontracts. 15 U.S.C. § 657(d)(1)(a).

51.    Normally under SBA "affiliation" regulations, qualifying small business concerns are prohibited from receiving significant business assistance from non-qualifying companies. However, the SBA authorizes a waiver to affiliation so long as the participants in the MPP fully comply with the procedures set forth in 13 C.F.R. § 125.9. Also, affiliation can be "found for other reasons set forth in 13 C.F.R. § 121.103." *Id* at (d)(B)(4). Generally, affiliation exists when one entity merely can exercise control over the other entity. 13 C.F.R. § 121.103(a)(1). Control does not have to be exercised, it may be affirmative or negative, can be direct or indirect, and or exercised via 3rd parties. *Id* at (a)(1), (3-4).  The SBA considers multiple factors when assessing whether affiliation exists to include: "ownership, management, previous relationships with or ties to another concern, and contractual relationships." *Id* at (a)(2). Ultimately, the SBA uses the "totality of circumstances" test when assessing whether affiliation exists, and "may find affiliation even though no single factor is sufficient to constitute affiliation." *Id* at (a)(5).

15

52.     The SBA may determine whether affiliation exists in circumstances where there are questions involving:  stock ownership of the concern, common management, an identity of interest, newly organized concern rule, and engagement in joint ventures. 13 C.F.R. §103(c) and (e - h).

53.     Under stock ownership regulations, a service-disabled veteran must control 50% or more of the concern's voting stock or an affiliation exists. *Id* at (c)(1). A question of affiliation exists when senior officers, members, or management of one organization have the ability to control another concern. *Id* at (e). Also, affiliation can exist when two or more individuals share identical business or economic interests. *Id* at (f). In fact, the "SBA may presume an identity of interest based upon economic dependence if the concern in question derived 70% or more of its receipts from another concern over the previous three fiscal years." *Id* at (f)(2). If former senior members or "key employees" of one entity form another concern in the same or related industry and then begin to arrange business relationships where the older firm feeds the newer firm, then an affiliation may exist. *Id* at (g).  Finally, an affiliation may exist when two (2) entities enter more than three (3) joint ventures over a two-year period. *Id* at (h).

54.     The waiver on affiliation for the SBA MPP is limited to "technical and/or management assistance; financial assistance in the form of equity investments and/or loans; subcontracts (either from the mentor to the protégé or from the protégé to the mentor); trade education; and/or assistance in performing prime contracts with the Government through joint venture arrangements." 13 C.F.R. §125.9(a).  The protégé may convey up to 40% equity interest to the mentor. *Id* at (d)(2).

55.     The mentor and protégé must execute a written agreement specifying the assistance provided by the mentor to the protégé. *Id* at (e)(1).  Additionally, the plan must

demonstrate how the mentor's help promotes the protégé's goal as outlined in the written agreement. *Id* at (e)(1)(i).

56.    The assistance must be for a period of at least one year. *Id* at (e)(1)(iii). Also, the SBA must be notified in writing and in advance of any changes to the assistance provided by the mentor to the protégé. *Id* at (e)(6). A failure to notify and secure approval from the SBA of a change "shall" end the mentor-protégé authorized relationship. *Id.*

### I.    JOINT VENTURES UNDER THE SBA MENTOR-PROTÉGÉ PROGRAMS.

57.    The SBA MPP not only authorizes business development assistance from a mentor to a protégé, but it also permits the formation of joint ventures between mentors and protégés.  13 C.F.R. § 125.9(d)(1).  If mentors and protégés wish to secure exclusion from affiliation, then they are required to submit a written agreement setting forth specific provisions as outlined in 13 C.F.R. §125.8(b)(2), (c), and (d). *Id* at (d)(1)(ii).

58.    These regulations are extensive, and participants must enter into an express agreement that contains specific and mandatory provisions outlining JV operations.  13 C.F.R. §125.8(b)(2)(i-xii). The small business ("managing concern" or "protégé") must designate a project manager to oversee performance of the contract. *Id* at (ii).  The project manager cannot be an employee of the mentor nor move as an employee from mentor to protégé for the purpose of working the joint venture contract. *Id*.

59.    The protégé must own 51% of the entity created for the purpose of managing the joint venture. *Id* at (iii). The profits of the joint venture must be distributed to the mentor-protégé in conformity with the work performed by the entity. *Id* at (iv).  All monies paid because of performance under a set-aside must be deposited into a designated bank account in the name of

17

the joint venture. *Id* at (v). Furthermore, all expenses paid by the joint venture must be paid from the same account. *Id*.

60.    The joint venture agreement must also spell out the roles and responsibilities of the mentor-protégé. *Id* at (vii). The accounting and administrative records of the joint venture are to be in the possession of the protégé unless the SBA grants a written approval for the exception. *Id* at (ix).

61.    These requirements ensure the protégé is meaningfully engaged and is not a mere shell. Specifically, to that point, the SBA requires that the protégé "must perform at least 40% of the work performed by the joint venture." 13 C.F.R. 125.8(c)(1). The work performed by the protégé "must be more than administrative or ministerial functions so that it gains substantive experience." *Id* at (c)(2).

62.    Before work commences on a set aside contract by a joint venture, the protégé must submit a written and signed certification, by authorized officials of both protégé and mentor, to the SBA and contracting officer that stipulates full compliance with paragraphs 13 C.F.R. 125.8(b) and (c). *Id* at (d).

## V.    **FACTUAL ALLEGATIONS**

63.    On November 5, 2020, WCI submitted a set aside bid for work at the Bath VA Medical Center under solicitation # 36C24220B0058. The work involved the construction of steam and condensate lines at the medical center. Within days of the submission of his bid, Welch learned that the lowest and awarded bidder was Defendant ACJV1L, an SDVOSB qualified joint venture between Defendant entities AFCI and CCI. Welch reached out to Relator Sechrist to assist investigating Defendants and to help prepare an SDVOSB status protest because of observing troubling business practices (see details below at V(A)(i)) on the part of

Defendants. Relator Sechrist was familiar with Defendant entities as he was asked in August 2015 to assist in another SBA SDVOSB protest involving Defendant entities ISSI and BEI (see details below at V(C)(iii)).

64.    Relators, via WCI, submitted a timely bid protest on November 10, 2020.  WCI's primary allegation was to question the SDVOSB status of Defendant AFCI due to improper affiliation with Defendant CCI.  WCI raised five (5) allegations in this protest and named all five (5) Defendant entities AFCI, CCI, BEI, ISSI, and ACJV1L:

- First, that Defendant entities AFCI, CCI and BEI were all located in the same office building at 837 Oakton Street, Elk Grove Village, Illinois.

- Second, that Defendant entities AFCI and CCI were improperly affiliated thus making AFCI unqualified to be a SDVOSB. Further that Defendant CCI was involved in the pre-bid subcontracting solicitations without any effort by Defendant AFCI.

- Third, that Defendant entities CCI and ISSI were involved in lawsuit where the allegations were that they were one and the same entity. This was evidence that Defendants were using SDVOSBs as a scheme to secure business.

- Fourth, that Defendant entities CCI and BEI were affiliated because they were owned by Oehler.

- Fifth, that Defendant AFCI and/or AFCI-CCI might not be able to perform that Bath VA contract. WCI requested the right to amend the initial protest due to time constraints.

65.    Subsequently, on December 8, 2020, the SBA's OHA served a copy of the CVE Protest (Docket # CVE-2020-12-08-130) to WCI, Defendant AFCI and Roeckell, and the Director of Center for Verification & VA Counsel. Responses to the protest were due to the OHA by December 30, 2020.

66.     Relators then initiated a more comprehensive investigation which led to the submission of a supplemental package on December 29, 2020. The supplement included the following additional allegation:

- Sub-contractors working in the Bath area, and known by Welch, stated all pre-bid workup communications were solely with Defendant CCI with no contact at all with Defendant AFCI.

- Defendant entities AFCI and CCI had multiple other contracting projects.

- Defendant entities CCI and ISSI were also involved in other recent Government procurements, which was evidence of potential fraud involving "rent-a-vet" scheme.

- Defendant AFCI had only ten (10) employees, which was insufficient to staff the contracts awarded to Defendant entities AFCI-CCI, which was valued collectively in the millions of dollars.

67.     Defendants submitted a response to WCI's protest on December 30, 2020. The response contained multiple knowing misrepresentations, which Relators expose in detail below in this complaint (see details below at V(C)(i-ii)).

68.     On March 10, 2021, WCI received the OHA's Decision, wherein the OHA stated WCI's allegations were "untimely or nonspecific," hence the protest was "dismissed." However, Relators recognizing that their investigation had uncovered significant evidence of potential fraud on the SDVOSB program, thus Relators drafted and submitted a letter to the VA OIG on September 20, 2021. The contents of this package to the OIG included: 1) WCI's original OHA protest, 2) WCI's supplemental submission to OHA, and 3) the OHA Ruling Response. Subsequently, on November 3, 2021, the VA OIG Hotline transmitted an email to WCI indicating that OIG opened a case based on a review of WCI's September letter and information.

**A.     RELATORS' FIELD INVESTIGATION DETERMINED DEFENDANT CCI PERFORMED ALL PRE-BID WORKUP AND POST-BID INVOICING FOR SUBCONTRACTORS ON SDVOSB and VOSB SET ASIDE CONTRACTS.**

69.    Relators were intimately familiar with the requirement that SDVOSBs cannot be owned or controlled by other entities. This effectively means even in those situations where the participants are enrolled in an SBA approved JV or MPP, the SDVOSB cannot be a passive participant. Instead, the SDVOSB must be actively involved in the work on a set aside contract and remain in compliance with applicable Government regulations as well as the terms of each distinct JV or MPP agreement. Further, and most importantly, the SDVOSBs' performance on the set aside contract must ultimately comport with the intent for each program, that is the Mentors help or assistance "so the protégé firms may more fully develop their capabilities." 13 C.F.R. § 125.9(a).  These requirements are unambiguous and expressly explained in the sample MPP agreement on the SBA website: https://www.sba.gov/sites/sbagov/files/2022-07/SBA%20Mentor-Protege%20Program%20Agreement%20Guide-v2-508%20Rev.pdf.

70.    Thus, the MPP agreement must lay out detailed and specific tasks and roles for each participant in the MPP agreement. But even more importantly, the sample specifically highlights via capital letters, underlined, and bold letters, the following:

> "For each of the assessed needs addressed in the paragraph above, the Protégé must describe in detail: **WHAT** specifically will the mentor do to meet your need, **WHEN** (detailed timelines or number of hours in annual increments) the assistance will be provided, and **HOW** you will measure whether each of your needs have been successfully met and **HOW** the assistance will help the protégé enhance its growth and/or foster or acquire needed capabilities, as per 13 C.F.R. §125.9."

71.    Relators knew, and the last two lines of the above paragraph confirmed, the purposes of the MPP program was to facilitate the training and development of the SDVOSB, and not for the Mentor to solely perform the work under the JV and/or the MPP.  Therefore, any indication of systematic non-involvement of SDVOSBs in the handling or managing of the day-

to-day activities of important non-administrative tasks on Government set-aside contracts defeated the purpose and intent of the JV and MPP and is potentially an indicator of fraud.

72.     Here, Relators' field investigation developed clear unambiguous evidence demonstrating that neither Defendant entities AFCI nor ACJV1L were involved in the crucial pre-bid work up on multiple set aside contracts nor were they involved in the subcontracting invoicing process for another set aside contract.

### i.     CCI performed all pre-bid estimating work-up at the Bath VA Project in November 2020, which should have been performed by ACFI.

73.     Relators' initial field investigation in November and December of 2020 focused on contacting subcontractors in the central New York area and was led by Relator Welch. The specific effort on this investigative task was to uncover evidence of Defendants' pre-bid activities and contact with regional subcontractors, and the details of those interactions.

74.     Relator Welch spoke with the following individuals at each subcontractor: 1) Steve Porter, Estimator with Emerald Electric in Syracuse, New York;  2)  Corey Eastman, Estimator with Edward Schalk & Son in East Syracuse, New York; 3) Larry Hopkins, President of Erie Mechanical in East Syracuse, New York; 4) Jason Lee Dutton, Director of Sales with BR Johnson in East Syracuse, New York; 5) Erich Burnham, CEO of Power-Comm Electric in Syracuse, New York; and 6) Tom Singer, Project Manager of Bon Ton Glass Company in Syracuse, New York.

75.     First, Relator Welch confirmed with each subcontractor that CCI contacted them about the Bath VA project. And second, that each subcontractor confirmed that CCI was the sole entity involved in the Bath VA Project pre-bid discussions.

ii.   **On a second set aside contract, in March 2022 at the VA Medical Center in Montrose, New York, CCI again performed the estimating pre-bid duties for ACJV1L.**

76.   On March 31, 2022. Relator Welch learned that Defendant ACJV1L was the lowest bidder on VA Solicitation 36C24222B0014. This solicitation was for a 100% Veteran-Owned-Small-Business ("VOSB") set aside. This project was for the rehabilitation of Building 13, Ward AB at the VA Medical Center in Montrose ("Montrose VA Project"), New York. ACJV1L's winning bid was $15,458,000. WCI, in conjunction with subcontractor GreenWay USA ("GreenWay"), which is building subcontractor located in the New York City metro area, also entered a losing bid on this solicitation for $18,270,000.

77.   However, a day prior to the unsealing of the bid, Jon Lascala, ("Lascala") an estimator for Defendant CCI, emailed Matthew P. Nolty,("Nolty") the Chief Executive Officer for GreenWay. Lascala's email was sent to Nolty via a blast from a solicitation website called "BuildingConnected," which can be found at buildingconnected.com. The header to the email states "[f]rom Jon LsScala (Cornerstone Contracting Inc.) team@buildingconnected.com." The email was sent on Wednesday, March 30, 2022, at 12:14 pm. The subject was "BIDS DUE – VAMC – Montrose, NY -Renovation of Building 1…." The content of the message stated: "BIDS DUE. Attention bidders, Proposals are due today by COB. Please feel free to send your proposal through building connected or directly to me – jlascala@ccicontractinginc.com. Feel free to reach out with any questions. Thanks, Jon LaScala."

78.   Upon receiving this email, Nolty immediately forwarded it to his contact at WCI, Project Manager Doug Arnold ("Arnold"). Arnold then forwarded the same email to Relator Welch. Thus, on the following day when the bids were unsealed and Defendant ACJV1L was the lowest bidder, Relator Welch recognized that neither Defendant entities AFCI nor ACJV1L were

involved in the Montrose VA Project pre-bid workup. Instead, Defendant CCI was clearly again performing all the bid workup, as they did with the Bath VA Project.

### iii. Defendant CCI not only performed pre-bid workups for Defendant ACJV1L, but Defendant CCI also entered into express subcontractor agreements and collected invoices for work being performed on a third Defendant ACJV1L set aside contract.

79.     On March 16, 2022, Relators spoke to James Gray ("Gray"), President of Gray Co Corporation of Upstate New York ("Gray Co"), Gray Co is located at 85 High Tech Drive, Rush, New York 14543. Gray confirmed that in or about May 2021, he received a request to provide a bid for construction services related to a government contract for a building addition at the Bath Cemetery Project.

80.     This initial bid solicitation was telephonically from an unidentified female working for Defendant CCI. Subsequently, Gray received a follow up telephone contact by Darren (last name unknown), also of Defendant CCI.  Shortly thereafter because of these pre-bid solicitations, Gray Co provided Defendant CCI a Request of Proposal ("RFP"). Gray went on to tell Relators that he believed that Defendant CCI had previously requested RFPs on other projects in the central New York area, however, the Bath Cemetery Project was the first time Gray Co worked for Defendant CCI. Relators knew the Bath Cemetery Project was a 100% SDVOSB set-aside, which was solicited (# 36C786-20-B-0009) by the government on July 21, 2020.

81.     Relators also learned from Gray that on June 14, 2021, Gray Co received a letter with an attached contract from Defendant CCI for the Bath Cemetery Project. The letter was on Defendant CCI's letterhead, and the Master Contract was with Defendant CCI.  The Defendant CCI signatory on the contract was Blake.  In the Master Contract, a reference was made to any

24

"upstream contractors" involved in the project, but no specific entities were identified.  On the same date, Gray Co received a Project Specific Agreement that for the first-time referenced Defendant ACJV1L. Gray stated he was concerned because all his work on the Bath Cemetery Project bid prep was exclusively with Defendant CCI, but now the project specific contract referenced Defendant ACJV1L.  Gray sent an email to Defendant CCI inquiring about the JV and was advised by Defendant CCI for the first time that Defendant ACJV1L was a joint venture between Defendant entities AFCI and CCI.  After this clarification, Gray Co entered into a subcontractor agreement with Defendant CCI to begin work on the Bath Cemetery Project. Gray Co began work on the project in November 2021.

82.     To confirm his work on the project Gray gave Relators a copy of an "AIA Type Document Application and Certification for Payment ("Cert and Pay Application")." The Cert and Pay Application, dated April 30, 2022, was an invoice for work done by Cray Co at the Bath Cemetery Project. The value of the original contract was $233,000 and a change order for $30,808.78, was reflected on the application. Relators examined the document and noted that there was no mention of Defendant entities ACJV1L or AFCI, solely Defendant CCI and its address at 831 Oakton Street, Elk Grove Village, Illinois, 600007.

83.     Relators now had direct evidence of three (3) separate set aside contracts where Defendant CCI exclusively performed pre-and-post bid activities for Defendant ACJV1L. Further, Relators also secured evidence that Defendant CCI was negotiating and entering into express agreements with subcontractors on set aside contracts without any input whatsoever from Defendant entities ACFI or ACJV1L.  Because Relators were subject matter experts in both the SDVOSB program and the field of general building contracting, they recognized that Defendant CCI's actions were potentially in violation of multiple Government laws and regulations on

ownership and control over SDVOSBs. But even more egregious, these potential violations were directly responsible for the loss of business opportunities for not only WCI but also for other legitimate SDVOSBs that bid on these projects and lost due to the fraudulent scheme by Defendants.

### iv. Defendant ISSI won two (2) SDVOSB set aside contracts in Albany, New York.

84. Relators uncovered that Defendant ISSI won two (2) contracts in Albany, New York. This was the first time that Relators discovered that Defendant ISSI was being used to win SDVOSB set aside contracts in New York. All previous schemes involved Defendant entities AFCI, and ACJV being used as a shell and Defendant CCI performing all the work.

85. The first Albany contract was a United States Army SDVOSB set aside ("Army Contract") won by Defendant ISSI under solicitation # W912DS16B0003 for electrical work. The Army Contract went through several modifications and the last modification was signed on March 30, 2021. This last modification in March 2021 had an action obligation value of $1,311,923, with a total value for all modifications at $9,095,905.

86. The second was a VA SDVOSB set-aside contract won by Defendant ISSI under solicitation # VA70117R0033.This VA Contract also went through multiple modifications with the last singed on June 29, 2021, for an action obligation value of $1,99,714 and a total value of $1,897,320. This contract was for performance at the Albany VA Medical Center and was a project for the construction of a combined heat and power boiler.

### B. RELATORS' IN-DEPTH DOCUMENT RESEARCH CORROBORATES THAT DEFENDANT ENTITIES WERE IMPROPERLY AFFILIATED.

87.     Besides the field investigation, Relators began an exhaustive search of on-line records to ascertain the relationship between Defendants. Relators pulled information from multiple on-line resources.

### i.   All Defendants, except ISSI, are co-located in one Office Building, and ISSI is headquartered in a residential home.

88.     Relators' first and most obvious investigative finding was that Defendants, except Defendant ISSI, were reportedly headquartered in the same office complex building on Oakton Street in Elk Grove Village, Illinois. Defendant ISSI's headquarters is Rush's residential home on a residential street, which is less than ten (10) miles from the rest of the Defendant entities.

89.     Relators found the location of Defendant ISSI's headquarters in Rush's residential home particularly noteworthy given the FPDS data showed that Defendant ISSI had two-hundred and eighty-seven (287) total contract entries worth $158,514,678.04. Initially, Relators expected such a large operation to have its own commercial headquarters, but as they dug deeper into the Defendants, Relators understood Defendant ISSI did not require its own facility as Defendant entities BEI and CCI performed all the work.

### ii.   Defendant Executives, employees, and multiple entities are affiliated /or shared across Defendant entities.

90.     Relators, shortly after finding that Defendants were co-locating in one office complex and Defendant ISSI's unorthodox residential headquarters, turned their attention to the Defendant entities and the personnel associated with the entities. Here, Relators' investigative efforts uncovered additional very unusual connections that corroborated the fact that Defendants were closely affiliated due to connections involving ownership, management, and contractual relationships. For example, Defendant CCI was founded by Oehler on October 14, 1994, but at the time the name was Broadway Construction, Inc. ("BCI"). Subsequently, on August 23, 2012,

27

BCI's name changed to Defendant CCI. Then Defendant BEI employee Blake, joined Defendant CCI as President.  Relators also learned that Rush, President of Defendant ISSI, was formerly a manager with Defendant BEI, before Defendant ISSI was founded. Thus, Relators exposed that the most senior executives of Defendant entities ACFI, CCI, and ISSI, all worked for Defendant BEI at one point before assuming their executive role in their respective Defendant entity.

91.	Relators also learned that Blake was the President of Payroll Associates, Inc, ("PAI") an entity that shares the same address as Defendants on Oakton Street.  PAI was in the business of payroll processing and was incorporated in Illinois on April 24, 2015. At the time of its founding PAI was known as Broadway Electric Admin., Corp, but it later changed to PAI on December 28, 2015. On March 19, 2019, Defendant entities BEI and CCI, as well as PAI, submitted a joint UCC filing (# 24230643) and the secured party was Village Bank & Trust, which is located at 234 West Northwest Highway, Arlington Heights, Illinois 60004.

92.	Also, Defendant entities BEI and CCI, as well as PAI, share the same corporate agent, Margery Newman ("Newman") Newman is located at 200 North LaSalle Street, Suite 2700, Chicago, Illinois, 60601. Relators determined that Newman is an Illinois attorney with the Chicago law firm of Downey & Lenkov, where she focuses her practice on complex litigation involving the construction industry.

93.	Relators learned the sharing of Defendant employees was common as Defendant AFCI, employed Terry Ann Hoehn-Stoll and she concurrently was a Senior Project Accountant for Defendant BEI. Also, another mid-level employee, Michelle Gohl ("Gohl"), worked simultaneously for Defendant entities CCI and BEI.  In fact, Gohl had two (2) business cards. One card identified her as an Estimator for Defendant CCI and the other identified her as a Project Coordinator with Defendant BEI.  Relators came into possession of the business cards in

28

the fall of 2021. Both business cards have the same physical address, 831 Oakton Street, Elk Grove Village, Illinois, 60007-1904. However, there are separate telephone numbers. The one with Defendant CCI was 847-378-1700 and the one with Defendant BEI was 847-979-4290. Gohl's Defendant CCI email address was mgohl@ccicontractinginc.com and Defendant BEI was mgohl@broadwayelectric.com. Finally, as indicated above, the State of Illinois LLC records report that Barr, a Defendant BEI employee, was the registered agent for Defendant ACJV1L.

### iii. Defendant created JVs to win set aside contracts, including a JV between Defendant entities AFCI and BEI, to win a City of Chicago contract worth $39M.

94.     Relators discovered during their investigation that Defendants shifted or created new entities or joint ventures for specific projects. For example, as detailed above, Defendant entities AFCI and CCI formed Defendant ACJV1L, and won the set aside bids for the Bath VA, Bath Cemetery, and Montrose VA Projects. During the course of their investigation, Relators learned that Defendant entities AFCI and BEI formed a JV called BEI-AFC Joint Venture One ("BAJV"). BAJV was created for the purpose of bidding on a massive City of Chicago electrical project at the O'Hare International Airport ("O'Hare Project") in September 2016. The O'Hare Project involved work on emergency and standby power system replacement generators 1-6, (Specification # 135580). The project dollar value was $39,502,000.

95.     Additionally, Relators uncovered that Oehler was listed as the Managing Venturer Project Executive and Roeckell was named as the Director of Field Operations. The BAJV agreement stipulated that Defendant BEI owned seventy (70%) and Defendant AFCI (30%) of BAJV. Importantly, Relators noted in review of the bid documents for the O'Hare Project, that Defendants included certifications of compliance with all local, state, and federal programs.

29

Defendant AFCI also provided copies of their state and federal participation in SDVOSB programs.

96.    Further review of the bid documents determined that Defendants opened a BAJV bank account at Park Ridge Community Bank, which was located at 626 Talcott Road, Ridge, IL 60068. Also, Western Surety provided the construction bond for the O'Hare Project. BAJV won the contract and worked it from June 2017 through 2020.[4]

97.    As Relators investigated further, they learned of additional questionable behavior on the part of Defendants. For example, when Defendant AFCI was headquartered at Hoffman Estates, there was another larger business entity named Kaegem Corporation, in the same building. Although Roeckell was President of Defendant AFCI at the time, with 40% ownership (60% was owned by F. Todd Polinchock, a Pennsylvania resident and real estate agent for Keller Williams), Roeckell was also listed as an employee of Kaegem. Relators realized that this cross pollination or sharing of employees even extended beyond Defendant companies as Defendant AFCI employee Marty Frankis, was also the President of Frankis Consulting[5]; a Chicago area estimating/pre-construction service firm. Further Michael Shamsie was listed as Defendant AFCI's Director of Engineering; however, he also served as the primary business contact for Landmark Engineering Group, Inc[6].; a Moline, Illinois firm.

**C.    RELATORS FILED A CVE PROTEST AND DEFENDANTS RESPONDED TO THE ALLEGATIONS WITH MULTIPLE MISREPRESENATIONS TO THE SBA OHA.**

---

[4] Defendant BEI website lists the O'Hare Project as being completed in 2020: https://www.broadwayelectric.com/projects/?CategoryId=11

[5] Frankis Consulting is located at 856 Red Barn Ln Elgin, IL, 60124-6551.

[6] Landmark Engineering Group, Inc's website is at http://www.landmark-engineering-group.com/about/

98.     As noted above, Relators via WCI, filed a CVE Protest on November 10, 2020, and supplemented the protest on December 29, 2020. Relators' protest incorporated multiple allegations detailed above in this complaint. Defendants filed a response to the CVE protest on December 30, 2020. The SBA OHA, on March 10, 2021, published its decision, denying in part and dismissing in part WCIs' protest. However, contained within the decision is a paragraph by the OHA where it summarizes Defendants' characterization of the non-affiliation or connection between Defendant entities AFCI and BEI:

> "Similarly, the relationship between Cornerstone and Broadway is irrelevant to the SDVOSB status of AFCI-CCI or American First. (*Id.*) There is no dispute that Cornerstone is a large business. However, because Cornerstone is the SBA-approved mentor of American First, Cornerstone's own size and/or affiliates have no bearing here. (*Id.*) **AFCI-CCI emphasizes that there is no common ownership or management between American First and Broadway. (*Id.*) Nor do American First and Broadway share employees. (*Id.*) American First and Broadway have never subcontracted work to each other, and there are no direct financial ties between them…**" (emphasis added).

99.     First, Relators noted Defendants did not dispute or even attempt to distance the relationship or affiliation between CCI and BEI. Relators understood the concession was made likely because Defendant CCI and BEI shared the same headquarters address and was easily verified via public records.  Instead, Relators observed that Defendants merely stated the Defendant CCI-BEI connection was irrelevant due to the MPP that was in place for Defendant entities AFCI and CCI.  However, second, and most pertinent and central to the allegations contained within this complaint, Defendants then attempted to dispel Relators' allegation that Defendant entities BEI and AFCI were affiliated or connected.

100.    Relators clearly understood the significance and importance of Defendants' denial because if Relators were successful in establishing the Defendant entities AFCI-BEI connection or affiliation, then Defendants' entire SDVOSB shell scheme was at risk of exposure to the

Government. Relators noted that several of Defendants' responses (as bolded in the above paragraph excerpted from OHA's decision) were factually inaccurate and or misrepresentations of verified information as outlined in this complaint.

### i. Defendants knowingly misrepresented in their CVE protest response that CCI and BEI did not share the same building with AFCI.

101. Relators alleged in WCI's protest that Defendant entities AFCI, CCI, and BEI all were co-located in the same building. Relators did not allege the same office, just the same building. Defendants responded by stating "[w]hile on the same street, it is clear that AFCI does not share the same building with CCI or Broadway." Relators note that this statement is untrue, in fact, a simple view of Google Maps confirms that Defendant entities AFCI, CCI, and BEI are all in the same large single story rectangular block office building that contains multiple companies in separate suites. Defendant entities BEI and CCI are at 831, which faces north towards Oakton Street. A driveway, which also leads to building parking, runs north to south on the west side of the building and then turns east to the back of the building. Additional suites access the building from the driveway and the northernmost suite on the west side of the building is 837, which is occupied by CS2 Design Group, LLC. The next suite 837-B is occupied by SSS Motorsports, LTD. This continues for three (3) additional suites before the turn to the east. Defendant AFCI is on the south side of the building in suite F, and the door to 837-F2 has a sticker with American First Contracting attached to it with its telephone number 847-519-9595.

102. Relators also note with interest that Pagoda Electric and Contracting, Inc., ("Pagoda Electric") occupies suite 837-F1. Relators' investigation had determined that Pagoda Electric served as a "Minority Owned Business Enterprise" ("MBE") subcontractor in the March 2017 O'Hare Project.

**ii. Defendants attempt to hide affiliation or connection between AFCI and Broadway in their SDVOSB status response, but the O'Hare Project exposes Defendant knowing factual misrepresentation to the Government.**

103. Relators overarching allegation is that Defendant entities BEI and CCI are essentially operating as a single entity and that this entity uses Defendant SDVOSBs entities AFCI and ISSI as shells to win contracts. This critical point is what led Defendants to misrepresent the connection or affiliation between Defendant entities AFCI and BEI. For if Relators established this connection or affiliation, then the true elaborate fraud scheme perpetrated by Defendants over many years had the potential to be disclosed to the Government. Now, in this complaint, Relators established beyond question that the connection and affiliation existed between Defendant entities AFCI and BEI via the O'Hare Project.

104. This misrepresentation is particularly audacious given that depending on when the O'Hare Project ended, both JVs (ACJV1L and BA JV) could have existed concurrently as the O'Hare Project was not completed until 2020, and the Bath VA project started in 2020.

**iii. Defendant entities ISSI and BEI were involved in an SBA bid protest in August 2015 and Relator Sechrist was instrumental in investigating and facilitating the reporting of this protest.**

105. On August 28, 2015, Relator Sechrist was instrumental in assisting an SDVOSB, WEC, to submit an SDVOSB status protest involving Defendant entities ISSI and BEI. The owner of WEC, Wescott, reached out to Relator Sechrist for help in investigating and then filing the protest with the Contract Officer. The bid was under solicitation number GSA-03P-15-AZ-C-5050.

106. The protest submitted by WEC alleged:

- Defendant ISSI was controlled by Defendant BEI and Rush was employed by Defendant BEI.

- Defendant entities ISSI and BEI won over three (3) contracts within a two (2) year period which was in violation of the SBA's 3/2 Rule.

- Rush was also the owner of IPB, LLC (Duns # 831935312) a SAM registrant and the address of IPB, LLC (up to April 2013) returned to the same address as Defendant BEI.

**D.    RELATORS' INVESTIGATION PROVES THAT DEFENDANT ENTITIES AFCI AND ISSI ARE SHELLS AND UNLAWFULLY AFFILIATED WITH DEFENDANT ENTITIES BEI AND CCI, THUS ALL DEFENDANT SDVOSB AND VOSB CERTIFICATIONS ARE FALSE AND ALL SET ASIDE CONTRACTS WERE AWARDED UNDER FALSE INDUCEMENT.**

107.    Relators' investigation determined that Defendant SDVOSBs (and VOSB) AFCI and ISSI, and JV, ACJV1L, are shells entities and unlawfully affiliated with Defendant entities BEI and CCI. Thus, all Defendants SAM self-certifications for SDVOSB and VOSB status are false certifications. Further, these false certifications were then used by Defendants to falsely induce the Government to award Defendants $312M in aggregate set aside contracts.

### i.    <u>Defendant AFCI.</u>

108.    Since its first false SAM certification registration on October 11, 2010, Defendants falsely certified twenty-one (21) times that Defendant AFCI was a valid SDVOSB and VOSB.  The first false certification was on October 11, 2012, and the last was on March 13, 2023.

109.    As noted above, these false certifications on Defendant AFCI's SDVOSB and VOSB status has falsely induced the Government to award Defendants seventy-eight (78) separate entries for a sum of over $43M in action obligations.

### ii.    <u>Defendant ISSI.</u>

34

110.    Defendant ISSI's first SAM false certification occurred on September 10, 2013, when Defendants first registered Defendant ISSI as an SDVOSB and VOSB. Currently there are thirty (30) false certifications and the last was on April 7, 2023.

111.    As noted above, these false certifications on Defendant ISSI's SDVOSB and VOSB status has falsely induced the Government to award Defendants two-hundred and ninety-one (291) separate entries for a sum of over $158M in action obligations.

### iii.    **Defendant ACJV1L.**

112.    Defendant ACJV1L's first SAM false certification occurred on May 26, 2020, when Defendants first registered the JV as an SDVOSB and VOSB. Since that date, Defendants falsely certified Defendant ACJV1L as an SDVOSB and VOSB an additional seven occurrences: July 29, 2020, August 18, 2020, September 10, 2020, November 23, 2020, February 25, 2021, March 12, 2021, February 16, 2022, and the current and active registration on February 1, 2023.

113.     As noted above, these false certifications on Defendant ACJV1L's SDVOSB and VOSB status has falsely induced the Government to award Defendants seventy-five (75) separate entries for a sum of over $111M in action obligations.

### COUNT I

### Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A)).

114.    Relators incorporate by reference paragraphs 1-113 as if fully set forth in this paragraph.

115.    Relators seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act.

116.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or reckless disregard for the truth, presented and/or caused to be presented to the government false or fraudulent claims for payments.

117.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

## COUNT II

### Making or Using a False Record or Statement (31 U.S.C. § 3729(a)(1)(B)).

118.    Relators incorporate by reference paragraphs 1-113 as if fully set forth in this paragraph.

119.    Realtors seeks relief against Defendants under 31 U.S.C.§ 3729(a)(1)(B).

120.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, made, used or caused to made and used, false records and statements material to false and fraudulent claims that were made to the government.

121.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

## COUNT III

### Conspiring to Submit or Cause to be Submitted a False Claim or to Make or Use a False Record or Statement (31 U.S.C. § 3729(a)(1)(C)).

122.    Relators incorporate by reference paragraphs 1-113 as if fully set forth in this paragraph.

36

123.    Realtors seek relief against Defendants under 31 U.S.C. § 3729(a)(1)(C).

124.    As set forth above, in connection with the foregoing schemes, Defendants and their co-conspirators knowingly, or with deliberate ignorance or in reckless disregard for the truth conspired to submit or cause to be submitted a false claim, or conspired to make, use or cause to be made or used false records and statements material to false and fraudulent claims that were made to the government, and took actions to further these conspiracies.

125.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

## COUNT IV

## Common Law Fraud.

126.    Relators incorporate by reference paragraphs 1-113 as if fully set forth in this paragraph.

127.    Defendants made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with the claims for payment submitted by, or on behalf of, Defendants to the United States.

128.    Defendants intended that the United States rely upon the accuracy of the false representations referenced above.

129.    The United States made substantial payments of money in justifiable reliance upon Defendants' false representations.

130.    Defendants' actions caused the United States to be damaged in a substantial amount to be determined at trial.

## COUNT V

**Unjust Enrichment.**

131.    Relators incorporate by reference paragraphs 1-113 as if fully set forth in this paragraph.

132.    By reason of the payments to Defendants, Defendants were unjustly enriched. The circumstances of Defendants' receipt of the contracts at issue are such that, in equity and good conscience, Defendants are liable to account for and pay such amounts, which are to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators Matthew Welch and James Sechrist, on behalf of the United States, respectfully requests that:

a)    This Court enter an order declaring that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b)    This Court enter an order requiring Defendants to pay an amount equal to three times the amount of damages to the United States;

c)    This Court enter an order requiring Defendants to pay the maximum civil penalties for each such false or fraudulent claim;

d)    This Court enter an order awarding Relators the maximum statutory award for his contributions to the prosecution of this action pursuant to 31 U.S.C. § 3730(d);

e)    This Court enter an order requiring Defendants to pay all expenses, attorney's fees and costs associated with this action pursuant to 31 U.S.C. § 3730(d)(1); and

f)    Any and all other relief as this Court determines to be just and proper.

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury on all counts.

Dated March 22, 2026

Respectfully submitted,

By: /s/ D. Greg. Blankinship
D. Greg Blankinship
Bar Number: 519819
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
gblankinship@fbfglaw.com

Clark J. Bolton
Florida Bar Number 1008047
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
35686 US Highway North
Palm Harbor, FL 34684
(813) 225-6744 Telephone
cbolton@forthepeople.com

*Counsel for Relators*